COURT OF APPEALS
DECISION
DATED AND FILED

November 7, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP557**

**STATE OF WISCONSIN**

Cir. Ct. No. **2023SC6198**

**IN COURT OF APPEALS
DISTRICT IV**

---

LYVIA SKROBLIN,

    PLAINTIFF-APPELLANT,

 V.

JILL JOHNSTON YODER,

    DEFENDANT-RESPONDENT.

---

APPEAL from an order of the circuit court for Dane County: RHONDA L. LANFORD, Judge. *Affirm*.

¶1 BLANCHARD, J.[1] In this small claims action, Lyvia Skroblin has sued Jill Yoder claiming a breach of contract. Their contract called for Yoder to sell a horse to Skroblin and this transaction occurred. But, soon after Yoder

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(a) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

delivered the horse to Skroblin, it was diagnosed with lameness. Skroblin took the positions at trial that the lameness was possibly due to an unfavorable genetic condition that can result in a disease of the immune system, equine "Immune Mediated Myositis" ("IMM"), and that, at the time of the sale, Yoder expressly warranted that the horse did not have this genetic condition. The circuit court credited evidence to the effect that Yoder was not obligated, in connection with the sale, to have the horse screened for the genetic condition that can result in IMM. The court also found that Yoder did not in fact represent to Skroblin at the time of sale that the horse did not have the genetic condition.

¶2    Skroblin now appeals a judgment of the circuit court dismissing her complaint. Skroblin contends that the court erred by failing to conclude that Yoder breached an express warranty, an implied warranty, or both, that the horse was not fit for its intended use after sale because it was lame, regardless of what caused it be lame.

¶3    To the extent that Skroblin argues on appeal that Yoder breached an implied warranty, I reject that argument on the ground that Skroblin failed to raise the argument in the circuit court in any form, which she needed to do in order to preserve it as a potential basis for reversal on appeal. Skroblin's theory at trial was exclusively that Yoder breached an express warranty.

¶4    Regarding Skroblin's express warranty theory, I conclude that she fails to show that relevant factual findings made by the circuit court at trial were either clearly erroneous or not dispositive in resolving this issue against her.

¶5    Based on these two conclusions, I affirm the judgment.

**BACKGROUND**

¶6    Skroblin sued Yoder in October 2023.

¶7    The operative complaint alleges the following. In May 2023, Skroblin went to Yoder's property to negotiate the purchase of a horse with Yoder. Skroblin was accompanied by a horse trainer, who Skroblin retained to assist her in assessing horses for potential purchase. During negotiations over a particular horse that Skroblin ended up buying, Skroblin asked Yoder if the horse "had any of the genetic diseases that are panel tested," and Skroblin's trainer further asked Yoder whether the horse had any of six specific unfavorable genetic conditions. Pertinent here, the six-condition panel of genetic tests included one for a genetic condition that predisposes a horse to have IMM.[2] Yoder allegedly responded, "[M]y horses don't have any of that." Skroblin believed that Yoder was selling "a sound horse, with no genetic diseases." Skroblin paid the contract price of $12,000 in full, and the horse was delivered to her possession in June 2023. "Shortly after the horse was delivered, it became ill due to an infection and presented lameness on its four legs."[3] After months of assessments, one test

---

[2] For context, I note the following general, publicly available information, which is generally consistent with testimony given at trial. "Equine immune-mediated myositis (IMM) is a disease occurring in Quarter horses and QH-related breeds that typically causes rapid and severe symmetrical wasting of the topline muscles, often following exposure to or vaccination against respiratory infection by *Streptococcus equi*…. Among Quarter horses, IMM ... has a strong familial relationship, suggesting that predisposition to this disease has a genetic basis." University of California Davis–School of Veterinary Medicine, *Immune Mediated Myositis (IMM)*, https://www.vetmed.ucdavis.edu/labs/finno-laboratory/immune-mediated-myositis-imm (last updated April 8, 2019).

[3] Although the specific details do not matter to the analysis of any issue in this appeal, for context I note the following. Trial testimony suggested that, after the sale and transfer, the horse could not place significant weight on one of its front legs when it stood. Skroblin testified at trial that, as of that time, she was able to ride the horse, but that it was still "lame" and not "performing the way [Skroblin] intended [the horse] to perform" at the time of the sale.

revealed that the horse was "positive for IMM."[4] Skroblin informed Yoder about this test result and Yoder offered to provide Skroblin with a different horse. Specifically, Yoder offered to give Skroblin a horse that was at that time offered to the public for sale at the price of $6,800, in exchange for the horse that Skroblin bought for $12,000.

¶8      I turn now from the allegations in the complaint to the trial de novo that followed proceedings before a court commissioner. The circuit court trial occurred in March 2024. Neither party was represented by counsel. Both parties testified. Also giving testimony were the horse trainer who Skroblin retained, a veterinarian who treated the horse, and another horse trainer called by Yoder.

¶9      Much of the testimony at trial related to what Yoder did or did not say to Skroblin when Skroblin and her trainer negotiated the purchase of the horse with Yoder. Notably, there was a dispute in the witness testimony about whether Yoder represented to Skroblin that the horse did not have the genetic predisposition to IMM.

¶10     Undisputed, however, was the following testimony that Skroblin gave regarding relevant events. Skroblin did not have the horse assessed by a veterinarian (as opposed to the assessment of the horse trainer who accompanied her to the negotiations) before paying the $12,000 and accepting delivery of the horse. Fewer than ten days after the horse was delivered to Skroblin's possession,

---

[4] This allegation in the complaint is ambiguous. It could mean that the horse was diagnosed with the disease IMM, or it could mean that the horse tested positive for the genetic condition that predisposes a horse to have that disease. As summarized below, the testimony at trial suggested that there was a test showing that the horse had the genetic mutation that predisposes a horse to IMM.

it became lame. Over the course of several months, Skroblin sought treatment and testing for the horse from veterinarians in an attempt to obtain a diagnosis of the cause of the lameness, which persisted. There was an eventual test result showing that the horse had the genetic mutation that predisposes a horse to IMM. More than 90 days after delivery of the horse to Skroblin, Skroblin alerted Yoder about this genetic test result and complained of the continued lameness.

¶11 At the same time, the testimony at trial regarding the cause or causes of the horse's lameness was ambiguous in several respects. Regarding one apparently possible cause, Skroblin testified to the apparent effect that the lameness began at the same time the horse showed signs of an infection, namely, when one of its legs swelled. However, relevant testimony of Skroblin and her trainer was not clear on the following topics: when the infection was resolved; and the possible relationship between the infection and either the horse's persistent lameness or the genetic condition that predisposes a horse to IMM. Further, Skroblin and the veterinarian gave testimony that was unclear regarding a potential link between lameness and IMM. Although multiple witnesses referenced the concept of the horse "ha[ving] IMM" and it was undisputed that the horse ultimately tested positive for the *genetic condition*, there was not clear testimony that the horse either did or did not suffer from *the disease IMM* after the sale.

¶12 The circuit court ruled that Skroblin failed to prove Yoder's liability at trial. The court credited testimony by multiple witnesses that, at the time of the sale, horses had "only recently" begun being tested for the specific genetic condition at issue in connection with sales in relevant markets. The court further credited Yoder's testimony that she did not know at the time of the sale whether the horse did or did not have the genetic condition and no one asked Yoder at the

time of the sale whether the horse had been tested for the condition. The court also found that Yoder did not volunteer to Skroblin or Skroblin's trainer that the horse did not have the genetic condition. Further, the court concluded that Yoder did not have a duty to test the horse for the genetic condition. Instead, the court relied on testimony about practices in relevant horse-sales markets to conclude that at the time of the sale it was Skroblin's "responsibility," and not Yoder's, "to get the horse checked out in whatever way [that Skroblin] was concerned about and in whatever manner [that Skroblin] wished." Based on all of these findings and conclusions, the court determined that Yoder is not "liable for any damages that flow[ed] from the sale of" the horse.

## DISCUSSION

¶13     Skroblin makes two alternative arguments, one that she proved a breach of an express warranty and the other that she proved a breach of an implied warranty of merchantability. The first argument is that the circuit court erred in dismissing Skroblin's complaint because "the evidence … clearly showed that [Yoder] made an express warranty that the horse … was sound and well," and that Yoder breached this express warranty when the horse she delivered was diagnosed with lameness shortly after the delivery. The alternative argument is that the court erred in failing to conclude that the evidence established that Yoder breached an implied warranty of merchantability.

¶14     Yoder contends that the circuit court's unchallenged credibility findings defeat Skroblin's express warranty argument. As for an implied warranty theory of liability, Yoder makes two alternative arguments:  given pertinent statutory and regulatory authority, there could not have been an implied warranty

6

that horses are free from sickness or disease at the time of a sale; and any such implied warranty could not extend past the time of sale.

¶15    I address Skroblin's implied warranty theory first, because I do not reach the merits due to forfeiture.

### Forfeiture of Implied Warranty Theory

¶16    For multiple sound reasons, this court generally does not consider arguments in favor of reversing circuit courts that are raised for the first time on appeal. *See State v. Huebner*, 2000 WI 59, ¶10, 235 Wis. 2d 486, 611 N.W.2d 727; *State Farm Mut. Auto. Ins. Co. v. Hunt*, 2014 WI App 115, ¶32, 358 Wis. 2d 379, 856 N.W.2d 633. Put otherwise, when a party fails to raise an issue in the circuit court in a manner that allows that court to resolve the issue and correct any potential error, the party in most cases forfeits the opportunity to argue on appeal for reversal based on that issue. *See Schill v. Wisconsin Rapids Sch. Dist.*, 2010 WI 86, ¶45 & n.21, 327 Wis. 2d 572, 786 N.W.2d 177; *see also Schonscheck v. Paccar, Inc.*, 2003 WI App 79, ¶11, 261 Wis. 2d 769, 661 N.W.2d 476 ("A fundamental appellate precept is that we 'will not ... blindside trial courts with reversals based on theories which did not originate in their forum.'" (quoting *State v. Rogers*, 196 Wis. 2d 817, 827, 539 N.W.2d 897 (Ct. App. 1995))).

¶17    Here, the record firmly establishes that Skroblin did not present a breach-of-implied-warranty theory at trial. To begin, the operative complaint states only that Skroblin pursues a breach of express warranty. Then, at trial, Skroblin told the circuit court that her "claim is based on breach of contract express warranty," and throughout the course of trial, no one mentioned the concept of an implied warranty of fitness or merchantability.

¶18 Based on this record, at trial the circuit court properly directed its attention to proof regarding what Yoder did or did not express to Skroblin and her retained horse trainer about the condition of the horse. I do not discern in the trial record an effort by either party—most importantly by Skroblin—to clarify for the court that an implied warranty theory could provide an alternative basis for liability.

¶19 Forfeiture is a rule of judicial administration, which means that this court has the discretion to overlook it, *see State v. Kaczmarski*, 2009 WI App 117, ¶7, 320 Wis. 2d 811, 772 N.W.2d 702, but there is good reason not to do so here. At the time of trial neither Yoder nor the circuit court was put on notice about the relevance of merchantability in horse sales, which would have involved addressing statutory and case law authority that Skroblin raises for the first time on appeal. *See* WIS. STAT. §§ 402.314(1)-(2), 402.316(3)(c), 95.195; *Wilson v. Tuxen*, 2008 WI App 94, 312 Wis. 2d 705, 754 N.W.2d 220.

¶20 I recognize that Skroblin was not represented by counsel in the circuit court. But then again, neither was Yoder. And in any case, forfeiture rules generally apply to pro se parties. *See Townsend v. Massey*, 2011 WI App 160, ¶27 n.5, 338 Wis. 2d 114, 808 N.W.2d 155. Further, the basic distinction between a promise that is binding because it was expressed by the promisor and a promise that is binding even if it was not expressed by the promisor is not a difference that requires legal training simply to recognize. It is fair to say that legal rules and doctrines in particular cases might become nuanced when lawyers and judges analyze cases beginning from that starting point, but the starting point is a common sense notion for anyone seeking to place blame in at least some contract disputes.

¶21 In a related vein, I acknowledge that, because this is a small claims action, a degree of informality in pleading, presenting proof, and argumentation is permitted toward the goal of reasonably simple and efficient resolutions of small claims actions. *See* ***King v. Moore***, 95 Wis. 2d 686, 690, 291 N.W.2d 304 (Ct. App. 1980) (a primary goal of small claims actions is to resolve disputes quickly and efficiently). But forfeiture is appropriate here because Skroblin failed even to refer to the concept of an implied warranty, not because she failed to base a persuasive argument on a specific legal precedent or doctrine. Indeed, it would undermine the goal of speedy and efficient resolutions of small claims actions to expect circuit courts to search for and explore alternative theories of liability that are not even referred to by the parties.

¶22 In sum on this issue, it would be unfair to allow Skroblin to potentially prevail on this new theory on appeal, and I do not address the merits.

**Express Warranty of Soundness and Wellness**

¶23 Skroblin argues that the circuit court erred in treating as dispositive the court's finding that Yoder did not expressly warrant that the horse did not have the genetic condition that would have predisposed it to IMM. Instead, Skroblin contends, the court should have granted her relief because Yoder warranted at the time of sale that the horse was sufficiently healthy (*i.e.*, not lame) to be used for Skroblin's purposes post-sale. *See* WIS. STAT. § 402.313.[5] This argument fails for at least the following reasons.

---

[5] There is no dispute that horse sales such as this one are subject to the provisions of article 2 of Wisconsin's Uniform Commercial Code, *i.e.*, WIS. STAT. ch. 402. *See* ***Wilson v. Tuxen***, 2008 WI App 94, ¶49, 312 Wis. 2d 705, 754 N.W.2d 220 (citing WIS. STAT. §§ 402.102, 402.105(1)(c)).

¶24    Skroblin does not come to grips with the circuit court's explicit finding, which Skroblin does not show to be clearly erroneous, that the horse was "healthy" for all relevant purposes at the time of sale. At one point during trial, the court said that "everyone agrees that [the horse] was healthy," and Skroblin did not object to that characterization. The court further took the position, again without objection by Skroblin, that all this left for resolution was the following issue: whether Yoder inaccurately told Skroblin in connection with the sale that the horse had been tested for the genetic condition at issue with a favorable result. There is support in the record for the court's finding that the horse was "healthy" at the time of sale. The horse trainer retained by Skroblin testified that the horse appeared "healthy and sound" when Skroblin went to Yoder's property and agreed to buy the horse. Skroblin herself testified that the horse did not show any sign of sickness until after its delivery, when it developed lameness at some point during the ten days following delivery.[6]

¶25    When the circuit court made an explicit finding that the horse was healthy at the time of sale, this implied a finding that, although the horse must have had the genetic condition, it was not experiencing the symptoms of IMM. Skroblin does not direct me to any trial evidence that would undermine the circuit court's apparent distinction between the genetic condition and ill health. This is especially so given the ambiguity of the testimony regarding whether there was a causal link between the lameness and the positive test for the genetic condition. *See supra* ¶11.

---

[6] At times, Skroblin asserts on appeal that the horse she bought from Yoder was "lame when sold," but the only parts of the record that counsel cites as purported support for this proposition do not support it.

¶26 In light of the circuit court's factual findings, Skroblin fails to explain how Yoder breached any express warranty that she made to Skroblin or to her retained horse trainer regarding the health and soundness of the horse at the time of purchase. Skroblin cites to *Nauman v. Ullman*, 102 Wis. 92, 78 N.W. 159 (1899), but that case is readily distinguishable on a key point. In *Nauman*, the purchaser of a horse established a breach of an express warranty that the horse was "well and sound except for a cold." *Id.* at 94. This warranty was breached because "the horse was not sound and well" at the time of sale—the horse was not merely suffering from a cold, but it had "a kind of blood poisoning, which the evidence tended to show must have existed before the date of the purchase." *See id.* at 93-94. In effect, the seller in *Nauman* warranted that what was ailing the horse was just a temporary cold, when in fact what was ailing it was blood poisoning. Here, in contrast, the only aspect of the horse that could be considered a defect that existed at the time of sale was the genetic mutation, and the circuit court found that Yoder did not warrant that the horse did not have the genetic mutation. That is, Skroblin fails to develop an argument that the findings of the court do not establish that the horse Skroblin purchased was "sound and well" to the full extent that Yoder expressly warranted.

¶27 Further, there is another way in which Skroblin's express warranty theory is undeveloped. Skroblin does not take into account multiple references in the record to an "exchange guarantee" that Yoder included in the contract. The exchange guarantee could limit Skroblin's potential remedies for any warranty breach, including a breach of an express warranty. *See* WIS. STAT. § 402.719. It was undisputed at trial that, under the exchange guarantee, Skroblin had a limited

time following the sale within which to have a veterinarian check the horse and, if a problem was detected, go back to Yoder to exchange it for a different horse.[7] Skroblin testified that she was aware of Yoder's "exchange guarantee" at all relevant times, and further that Skroblin was aware that under the exchange guarantee Yoder could not be obligated to make any "cash refund[]" to Skroblin. *See* § 402.719(1)(a) ("The agreement may provide for remedies … in substitution for those provided in [WIS. STAT. ch. 402] and may limit … the measure of damages recoverable under this chapter, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts."). And, to repeat, it is undisputed that Yoder offered Skroblin a different horse in exchange for the one that Skroblin purchased, albeit one with a lower value than what Skroblin believed she was receiving in the initial sale.

¶28    It is true that a seller's attempt to exclude or limit remedies is not always enforceable, such as under circumstances in which contractually limited remedies "fail of [their] essential purpose[s]." *See* WIS. STAT. § 402.719(2). But Skroblin makes no such argument, leaving unresolved what is at least the prospect that Yoder, as seller, could limit the available remedies for any breach of contract under § 402.719(1). Pursuant to Skroblin's express warranty theory, she seeks cash damages for the difference in value between the $12,000 she paid for the horse that she testified became lame and the alleged value of the horse that Yoder

---

[7] The length of time covered by the exchange guarantee was disputed at trial. Skroblin testified that Yoder gave her a 90-day window to avail herself of the guarantee; Yoder testified that it was 30 days. But whether the period was 90 days or 30 days, it remains that Skroblin fails to account for the potential significance of the exchange guarantee to her breach of contract claim.

offered in exchange. Yet Skroblin completely fails to account for a potential application of § 402.719 to exclude any such damages, assuming an alleged breach.[8]

## CONCLUSION

¶29 For all of these reasons, I affirm the order of the circuit court dismissing this action.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.

---

[8] On a possibly related note, Skroblin asserts that Yoder's offer of a different horse in exchange for the one that Skroblin purchased constituted some form of admission that establishes as a matter of law that there was a breach of contract. But Skroblin fails to support this assertion with legal authority that is on point, and therefore I reject this as an undeveloped argument. *See State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992) (an appellate court need not consider arguments that are inadequately briefed).